**UNITED STATES of America,
Appellee,**

v.

**Samuel BERGER, Yvette Feinstein and
Travis Levy, Appellants.**

**Nos. 903–905, Dockets 33962, 34321, 34322.**

United States Court of Appeals,
Second Circuit.

Argued July 9, 1970.

Decided Oct. 14, 1970.

Edward M. Shaw, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Robert G. Morvillo, Harold F. McGuire, Jr., Asst. U. S. Atty., on the brief), for appellee.

Jay H. Topkis, New York City (Daniel P. Levitt, Jack C. Auspitz, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, on the brief), for appellant Berger.

Daniel H. Greenberg, New York City, for appellants Levy and Feinstein.

Before FRIENDLY, SMITH and HAYS, Circuit Judges.

HAYS, Circuit Judge:

## I.

Samuel Berger, Yvette Feinstein and Travis Levy appeal from judgments of conviction entered after a jury trial in the United States District Court for the Southern District of New York. The indictment under which they were convicted was in three counts, each charging conspiracy to pay illegal kickbacks to labor union welfare and pension fund officials in violation of 18 U.S.C. § 371 (1964) and 18 U.S.C. § 1954 (1964).

Count One was dismissed at the close of the government's case. Levy was found guilty as charged under Counts Two and Three; Berger and Feinstein were found guilty as charged under Count Three. Levy received concurrent sentences of two years' imprisonment and a fine of $10,000 on each count. Berger received a sentence of five years' imprisonment and a fine of $10,000. Feinstein received a suspended sentence and was placed on probation for two years. We affirm the convictions of Berger on Count Three and of Levy on Count Two, and reverse the convictions of Feinstein and Levy on Count Three.[1]

## II.

Briefly described, the evidence introduced at trial detailed the efforts of Shiah Arsham,[2] who in late 1963 took over the management of Cashmere Corporation of America of Cleveland, Ohio, a manufacturer of sweaters and yarn, to obtain desperately needed financing for the corporation. Shortly after he became president of Cashmere, Arsham sought the assistance of Travis Levy, a Manhattan attorney. In early 1964 Levy and Arsham made a number of attempts to obtain mortgage financing from various sources without success.

Finally Levy approached Stephen Birnbaum,[3] a New York City mortgage broker, to discuss the possibility of obtaining a $1,500,000 mortgage loan for Cashmere from a labor union pension fund. In late May, Birnbaum proposed to his associate Herbert Itkin[4] that they develop the deal together. Various financial arrangements were made between the parties and Itkin enlisted the aid of James Plumeri,[5] who agreed to propose the Cashmere loan to the Furriers Union. Because of Cashmere's inability to obtain a promised appraisal of its assets, this deal fell through. By this time it had become necessary for Cashmere to obtain interim financing, while efforts continued to obtain a long term mortgage commitment.

The effort to obtain interim financing provided the basis for Count Two of the indictment. The government proved, primarily through the testimony of Itkin, that Itkin, on behalf of Levy and with his knowledge, made several illegal payoffs to Frank Zulferino,[6] the president of Local 10 of the International Brotherhood of Production, Maintenance and Operating Employees in return for a letter of financial commitment purporting to obligate Local 10's welfare fund to provide Cashmere with a $1,200,000 mortgage loan. It was understood that the commitment would never be used, its agreed-upon purpose being to con-

---

1. The reversal of Levy's conviction on Count Three means only that he will be relieved from paying one of the fines imposed upon him.

2. Arsham was named as a co-conspirator in all counts of the indictment. He testified as a witness for the government.

3. Birnbaum testified as a witness for the government pursuant to a grant of immunity.

4. Itkin testified as a witness for the government.

5. Plumeri, who was indicted on all three counts, became ill during the trial and a mistrial was declared as to him.

6. Zulferino was indicted on all three counts, but a mistrial was declared as to him when his attorney died during the trial.

vince banks to lend Cashmere short-term money. After several revisions of the letter and much in-fighting among the participants, Levy and Arsham in October 1964 received a commitment letter which they considered satisfactory. However the commitment did not prove helpful and they were still unable to obtain bank loans.

At the same time as the attempts to obtain interim financing on the basis of the Local 10 commitment were taking place, negotiations on the transaction which forms the basis of Count Three of the indictment were proceeding. The government proved, primarily through the testimony of Robert Graff,[7] a Chicago mortgage broker, that Graff, in collaboration with Berger, paid Floyd Webb,[8] a trustee of the Central States, Southeast, and Southwest Area Pension Fund of the International Brotherhood of Teamsters $20,000 in return for the Teamsters' giving Cashmere a mortgage of $1,500,000.

### III.

### Count Two

Levy concedes that if the jury believed Itkin they could have found Levy a knowing participant in the Local 10 kickback. However he argues that (1) it was improper to allow Itkin to testify as a coconspirator; (2) Itkin's explanation of why he lied to the F.B.I. was improper and prejudicial; and (3) certain portions of the trial court's charge were erroneous.

 Levy contends that since Itkin was not named as a co-conspirator in the indictment his testimony as to conversations he had with other alleged co-conspirators was hearsay and not admissible against Levy. This claim lacks merit since "it is enough if evidence, other than that whose admissibility is under challenge, disclosed * * * [a conspiracy]." United States v. Annunziato, 293 F.2d 373, 378 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L. Ed.2d 134 (1961).

Independent evidence established that while Itkin was reporting to and working with the F.B.I., he continued to make illegal pay-offs on his own, contrary to F.B.I. instructions. Indeed he admitted that he lied to the F.B.I. in order to conceal his own illegal involvement in the Cashmere deals. On these facts it was entirely proper to admit his testimony as that of a co-conspirator.

 On redirect examination Itkin testified that he lied to the F.B.I. to conceal the danger to his life that was involved in his activity.[9] The trial court instructed the jury as follows with respect to this evidence:

"Ladies and gentlemen, this testimony of the witness is not received for the truth of what was said either by the witness or by third persons but solely on the issue of his credibility. On cross-examination he was asked certain questions as to why he did certain things and his state of mind. I am permitting the government on redirect to explore that solely on the question of credibility. What the witness said to somebody about the matter or what the FBI said to him about

---

7. Graff pleaded guilty to Count Three on the eve of trial and testified as a government witness.

8. Webb died before the indictment was returned.

9. The portion of Itkin's testimony most strongly objected to is contained in the following colloquy:

"Q. But you said also on cross-examination that you concealed various things from Agent Vericker [an F.B.I. agent]; correct? A. Yes, I did, sir.

Q. Not only that, but you lied to him on many occasions; is that correct?
A. Yes, I did.
Q. Why did you lie?
. . .
A. I lied for two reasons. One is that, as in this case, I lied to him in June of 1965. My part of the involvement was to a great extent over. Mr. Vericker had one overriding concern and that was more important than anything else and he always judged what we did by the concern for my life and ✻ ✻ ✻ ✻"

it is not evidence as to the truth of what was said, but it is evidence pertaining to the witness's state of mind and it will be up to you and you alone to determine at the conclusion of the trial the credibility of the witnesses and the weight that you extend to the testimony given by each."

There was no error in the admission of the testimony accompanied by this instruction. United States v. Franzese, 392 F.2d 954, 960 (2d Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). See also United States v. Scandifia, 390 F.2d 244, 251 (2d Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969).

■■ Finally Levy argues that the trial court erred (1) in failing to charge that "specific intent" must be proven; and (2) in its charge on entrapment.

On the issue of intent, the trial court charged the jury:

"I have used the words 'Knowingly, unlawfully, wilfully.' An act is done knowingly if it is done voluntarily and purposefully and not because of mistake, accident, negligence or some other innocent reason. An act is wilful if it is done knowingly and deliberately."

This language was sufficient to inform the jury of the state of mind required to establish guilt. Further instruction on "specific intent" was unnecessary.

On entrapment the court charged:

"In considering that issue [entrapment] bear in mind that the burden is on the defendant to adduce some evidence that a government agent by initiating the illegal conduct himself induced the defendant to commit the offense. If you find that the defendant Levy has adduced such evidence then the government must prove beyond a reasonable doubt that the inducement was not the cause of the crime, that is, that the defendant Levy was ready and willing to commit the offense."

The charge is in accord with the position taken in this Circuit. See, e.g., United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952), reversed on other grounds, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); United States v. Henry, 417 F.2d 267, 269–270 (2d Cir. 1969), cert. denied, 397 U.S. 953, 90 S.Ct. 980, 25 L.Ed.2d 136 (1970); United States v. Guidice, 425 F.2d 886, 889–890 (1970).

## IV.

### Count Three

Feinstein and Levy both contend that the evidence was insufficient to allow the jury to conclude that either of them knew of or participated in the illegal kickback to Webb. We agree and therefore do not have to reach the other assignments of error urged by them.

#### A. Feinstein

■ On the crucial question of whether Feinstein knew that the illegal kickback was paid, all that appears is Graff's testimony that "I asked Mr. Berger once if Mrs. Feinstein knew that Mr. Webb was being taken care of, that he was to be given $20,000, and he told me that she knew that Mr. Webb and I were friends and in the situation I was taking care of Mr. Webb, but, I mean, I wasn't there." On the other hand Graff stated specifically that he never told Mrs. Feinstein that he was going to give Floyd Webb $20,000 out of the funds he received in connection with the Central State loan to Cashmere.

The government showed only that Feinstein used her position and contacts to get for herself a $22,500 fee which she wanted to conceal, and that she was somehow associated with Berger and Graff.

We hold that the evidence against Feinstein was insufficient to go to the jury.

#### B. Levy

■ The evidence against Levy on Count Three showed only that Levy met

with Feinstein and Graff to discuss financing for Cashmere, that at the time he asked Itkin's help in obtaining interim money for Cashmere from Local 10 Levy "guaranteed" to Itkin that the Teamsters would issue a loan commitment in a few months and that he promised that his Teamsters connections would get in touch with Itkin and Zulferino. It was also proved that Levy had an active part in helping Feinstein conceal payment of the $22,500 she received.

These facts fail to establish that Levy knew that Webb was paid an illegal kickback.

### C. Berger [10]

Appellant Berger concedes that Graff's testimony, if believed, was sufficient to allow the jury to find him guilty. However he argues that it was error for the trial court to deny his repeated motions for a severance and a separate trial. He contends that parts of the evidence introduced which pertained only to Count Two were so prejudicial to his case that we must reverse. In particular he submits that the testimony of Herbert Itkin requires this result.

■ Counts Two and Three were properly joined under Rule 8(b) Fed.R.Crim. P. Although the Local 10 commitment the Teamster's loan were different transactions, they were clearly parts of

"the same series of acts or transactions constituting an offense or offenses." *Id.* Levy's alleged participation in both transactions and the fact that in at least one important respect Itkin could have testified against Berger even in a separate trial,[11] (see United States v. Marti, 421 F.2d 1263, 1271–1272 (2d Cir. 1970)), justify the joinder as a substantial saving of judicial time.

■ While much of the evidence introduced at trial, including the bulk of Itkin's testimony, concerned only Count Two, the transactions involved in Counts Two and Three were quite separate and there is little possibility that the jury could have failed to ascribe the evidence to the count to which it related. Moreover the trial court's repeated limiting instructions provided an adequate safeguard against this possibility. See Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); United States v. Corallo, 413 F.2d 1306, 1327–1328 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); Stern v. United States, 409 F. 2d 819, 820 (2d Cir. 1969) (per curiam). Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), relied on by defendant, does not hold that such limiting instructions are always ineffective. See Frazier v. Cupp, 394 U.S. 731, 734–735, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); United States v. Corallo, *supra*, 413 F.2d at 1327.

---

10. Berger does not press here, but preserves for further appeal the question of whether his Fifth and Sixth Amendment rights were violated when the prosecution, having been advised that he would assert his constitutional right not to testify and knowing that he was a "target" of the inquiry, nevertheless summoned him before the grand jury and forced him to invoke his rights before that body, which then proceeded to indict him. See, e. g., United States v. Corallo, 413 F.2d 1306, 1328 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969) ; United States v. Wolfson, 405 F.2d 779,

784–785 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

11. Itkin described a meeting between Berger, Plumeri, Zulferino, Arsham and Itkin held in Berger's office in December, 1964 at which Plumeri threatened to stop the Teamsters' loan from going through. To prevent this, Berger guaranteed payment of $48,000 due on the unsuccessful Local 10 transaction, and agreed to halt Levy's attempt to demand repayment of monies given by Levy to Itkin to obtain interim union loans.

## V.

Finally all of the appellants contend that the trial court committed reversible error by questioning a juror out of the presence of counsel after the jury had commenced its deliberations.

The jury deliberated during the afternoon and evening of Saturday, May 17, 1969, and was then sent to a hotel for the night. Before the jury met on Sunday morning to continue its consideration of the case the Court learned that one juror had left the hotel and spent the night at home with her husband. The Court questioned the juror and determined that she had misunderstood the instruction that the jury was to be sequestered, but that she had neither read about the case nor discussed it with any one during her absence. "[C]onvinced that there had been no harm done," the Court permitted the jury to resume it deliberations.

When court convened shortly thereafter, counsel were notified of the incident. They claimed that since the trial court had not questioned the juror on the record, a mistrial was required. The Court denied that motion, recalled the juror and elicited on the record the same information as had previously been reported to counsel. None of the lawyers took up the Court's invitation to question the juror themselves.

While the better course for the trial court would have been to question the juror initially with counsel present, appellants can point to no prejudice resulting from the court's action. It certainly does not rise to the level of reversible error. See United States v. Breland, 376 F.2d 721, 722–723 (2d Cir. 1967).

Affirmed as to Berger, and as to Levy on Count Two. Reversed and indictment ordered dismissed as to Feinstein. Reversed and Count Three ordered dismissed as to Levy.