**UNITED STATES of America,**
**Appellee,**

**v.**

**Fred J. ZEEHANDELAAR, Defendant-**
**Appellant.**

**No. 781, Docket 73-2703.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 20, 1974.

Decided May 15, 1974.

Anne Sidamon-Eristoff, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D., New York, and John D. Gordan III, Asst. U. S. Atty., on the brief), for appellee.

Jac M. Wolff, New York City, for defendant-appellant.

Before LUMBARD, FRIENDLY, and TIMBERS, Circuit Judges.

LUMBARD, Circuit Judge:

After a five-day jury trial in the Southern District, Fred J. Zeehandelaar was found guilty on October 3, 1973 of violating 18 U.S.C. § 1001 by submitting false documents to the Department of Interior, Bureau of Sport Fisheries and Wildlife. He was fined $5000 and sentenced to one year's imprisonment, with execution of sentence suspended as to all but three months, the remainder to be served on probation. On appeal, Zeehandelaar maintains that there was insufficient evidence to sustain his conviction, that highly prejudicial hearsay testimony was erroneously admitted into evidence, and that there were various irregularities in the process by which the jury reached its verdict. We reverse.

On December 14, 1971, Zeehandelaar, an importer of wild animals, met with Stanley Brock, general manager of Wild Kingdom, Inc., an animal farm then being built in Orlando, Florida, to arrange for the importation of a variety of wild animals, including twenty cheetahs. At this meeting, Zeehandelaar stated that the cheetah was about to be placed on the Endangered Species List, after which time imports would no longer be permitted, except in instances of economic hardship such as where it could be shown that there was a pre-existing importation contract. Zeehandelaar emphasized to Brock that "a firm contract prior to listing" of the cheetah as an endangered species would thus be crucial. Brock placed an order on January 7, 1972. In a letter dated January 12, 1972, Zeehandelaar confirmed the order and included invoices for each of several species requested by Wild Kingdom. An invoice for twenty cheetahs indicated a purchase price of $35,000 duty paid, and a required advance payment of 25% or $8,750.

On February 1, 1972, Zeehandelaar attended a meeting of the National Council of Animal Transportation in Washington, D.C. While there, he inquired of Bernolt Palas, the Chief of Permits of the Bureau of Sport Fisheries and Wildlife, whether there was "anything new on the matter of endangered species." Palas informed Zeehandelaar that the Secretary of the Interior was about to sign a Notice of Proposed Rule-Making, which would declare the Department's intention of placing the cheetah on the Endangered Species List after a brief period of public comment.

According to Palas, a government witness at the trial, the Notice of Proposed

Rule-Making was itself quite significant because permits were generally not issued even in cases in which an importation contract was entered into prior to the placing of an animal on the Endangered Species List, if this occurred *after* the publication of the Notice of Proposed Rule-Making. Such a policy had the function of discouraging massive efforts to circumvent the regulation once the Department's intention became known and at the same time served to put importers on notice not to enter into any further importation agreements.

Palas testified that after speaking with Zeehandelaar he called the Department of Interior and was informed that the Secretary had already signed the Notice of Proposed Rule-Making. He then relayed this information to Zeehandelaar. On February 3, he met again with the appellant and supplied him with the Notice, which was published that same day in the Federal Register. The government also introduced into evidence a letter dated February 22, 1972, sent by the appellant to Palas regarding a permit for the importation of snow leopards, also listed in the February 2 Notice as a soon to be declared endangered species. In the letter, Zeehandelaar wrote that the dates of the orders for snow leopards "needless to say . . are prior to February 3, 1972 (date proposed amendment was published in the Federal Register)."

When Zeehandelaar took the stand, he denied that Palas had on February 1 told him anything more than that a Notice of Proposed Rule-Making would shortly be signed. He claimed not to have learned of the signing of the Notice until February 7. Further, he denied having met with Palas on February 3. Documentary evidence was introduced which established that on that date, the appellant was in Orlando, Florida. Indeed, Zeehandelaar testified that after the meeting in Washington, D.C. on February 1, he immediately flew to Florida to complete the deal with Wild Kingdom. Either on February 2 or February 3, he met with Brock and

typed a letter which he had Brock sign. This letter, back dated to January 17, purported to be a "firm order" by Wild Kingdom for twenty cheetahs. The letter stated that a check was enclosed for "advance financing as agreed." In fact, it was not until February 9 that a check was actually drawn payable to Zeehandelaar. This check was also back dated to January 17.

On February 7, several days after this meeting with Brock and before the check had been drawn, Zeehandelaar wrote Palas, declaring an intention to apply for a commercial permit to import cheetahs. In his letter, the appellant noted that "[o]n January 17, 1972 the order [for the cheetahs] was confirmed in writing with a check for 25% of sales value as deposit."

Zeehandelaar testified that the letter and check had been back dated to January 17 because on or about that date Brock received the appellant's confirmation letter of January 11 with invoices enclosed and because on January 17 they had reconfirmed the order over the phone. As for the letter of February 22 relating to the importation of snow leopards, in which he indicated knowledge of the significance of the February 3 date, the appellant testified that only after February 7, 1972, in a conversation with Palas, did he first learn the importance of having a contract before February 3.

On March 30, 1972, the cheetah was officially placed on the Endangered Species List and its importation was prohibited. Melvin Lovell, a government witness, testified that shortly thereafter, on April 15, he met with Zeehandelaar for about fifteen minutes at the Arizona Inn, in Tucson, Arizona, and was told that although importation of the cheetah had been banned, "we could back date the order" and thereby come within the economic hardship exception for cases involving pre-existing contracts.

Zeehandelaar denied categorically that any such meeting had taken place. Instead, he testified to a telephone call from Lovell, during which the latter

broached the question of back dating, to which Zeehandelaar responded: "Sorry, that can't be done." In rebuttal, the government called Frank Gilbert and Suzanne Pressman. Gilbert testified that he had been present in Tucson when Zeehandelaar met with Lovell and he corroborated Lovell's account of his conversation. Suzanne Pressman, an employee of the Humane Society of the United States, also corroborated Lovell's testimony, although she had not been present and had only heard about the meeting with Zeehandelaar second hand from Lovell later in the day on April 15 while riding in an automobile with Lovell, Gilbert, and their wives.

In a letter dated June 8, 1972, Zeehandelaar formally applied for a permit to import twenty cheetahs from Southwest Africa. Attached to his application were the letter he had typed and Brock had signed on February 2 or February 3, and the deposit check drawn February 9, both back dated to January 17. Although Zeehandelaar at no time in his letter expressly stated that these documents had actually been completed on January 17, he did state that, "[w]e were holding a bona fide order . . . confirmed in writing on January 17, 1972." Zeehandelaar further indicated that he had held a bona fide order "as described in our letter of 7 February 1972. . . ." As has been noted, the February 7 letter, which was enclosed with Zeehandelaar's application for a permit and the back dated letter and check, stated that "[o]n January 17, 1972 the order was confirmed in writing with a check for 25% of sales value as deposit."

The Bureau never acted on Zeehandelaar's application. On October 11, 1972, due to alleged financial considerations, he withdrew his application. Wild Kingdom's deposit was applied to the purchase price of the other animals which it had ordered and about whose importation no question of illegality had ever been raised. On December 6, 1972, Zeehandelaar was indicted and charged with knowingly making and using a false writing and document in violation of 18 U.S.C. § 1001 by enclosing with his application of June 8, 1972

> a photocopy of a check and letter both dated January 17, 1972, relating to an order from Wild Kingdom, Inc., for the purchase of said cheetahs and a 25% deposit on said order, and [representing] that said documents confirmed that he held a bona fide order on January 17, 1972, for the sale of said cheetahs, whereas in truth and in fact, as the defendant then and there well knew, the said check dated January 17, 1972, had not been drawn until February 9, 1972, and he did not on January 17, 1972, have the contract as described in said application.

## I.

Interpreting the indictment as charging that he misrepresented to the Bureau of Sport Fisheries and Wildlife that a bona fide contract was in existence on January 17, 1972, Zeehandelaar argues that insufficient evidence was presented at trial to sustain his conviction. He maintains that the undisputed evidence establishes that as of January 17, there was, in fact, a bona fide contract. In particular, he points to Stanley Brock's admission on cross-examination that as early as December 14, 1971 Wild Kingdom considered that it had entered into a firm commitment to purchase the twenty cheetahs, and that the deposit check drawn on February 9, 1972 actually represented a payment on account of the purchase price. Zeehandelaar's letter of January 11, 1972 confirming an order by Brock four days earlier, and accompanied by invoices setting forth purchase price and payment terms, is also relied upon as further support for appellant's assertion that there was a bona fide contract on January 17.

The government argues, however, that the indictment should be read as charging Zeehandelaar with not having had a contract "as described in [the] application" of June 8, 1972, even though he may have had a contract of some sort on that date. The government particularly

emphasizes Zeehandelaar's statement in his application for a permit that on January 17 he had a contract evidenced by a "firm order" letter and a deposit check, although neither of these were actually in existence at the time.

 Rule 7(c) of the Federal Rules of Criminal Procedure provides that an indictment should contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." The rule reflects the oft-stated principle that an indictment is defective if it fails to apprise the accused "with reasonable certainty, of the nature of the accusation against him."[1] United States v. Simmons, 96 U.S. 360, 362, 24 L.Ed. 819 (1877). *See also* United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1875); Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); United States v. Lamont, 18 F.R.D. 27 (S.D.N. Y.1955), aff'd, 236 F.2d 312 (2d Cir. 1956). The indictment here clearly failed to do this.

Indeed, the confusion regarding the offense charged resulted in the government and appellant trying their cases based on quite distinct theories of the crime charged. This confusion regarding the indictment, however, was not limited to the parties, but infected the court and jury as well. Thus, although the court generally interpreted the indictment along the lines urged by the government, at the pretrial hearing on a defense motion to dismiss the indictment, the court endorsed defense counsel's characterization of the indictment as charging, in essence, that Zeehandelaar had misrepresented that he had a bona fide contract on January 17. Rely-

ing on this statement by the court, Zeehandelaar prepared and presented his defense accordingly. Moreover, in its charge to the jury, the court failed to define precisely the offense charged and even suggested that Zeehandelaar could be convicted simply for having back dated the letter and the check attached to his application.

The court's confusion carried over to the jury, which throughout its deliberations evidenced considerable uncertainty as to the issue before it. Thus, at one point, jury note #6 was sent to the court asking whether the jury could "acknowledge the existence of a bona fide contract while still finding guilt in the application letter?" The court responded in the affirmative over the objection of Zeehandelaar's counsel.

Later, another question from the jury was addressed to the court, asking: "Can we separate guilt of predating January 17 letter stipulated February 3rd by attorney from application of permit." Because neither the court nor counsel fully understood this question the court requested clarification from the jury. Instead, the jury sent another note which appeared to be a verdict:

> We find Mr. Zeehandelaar guilty only of misrepresenting dates of contract and check submitted with his application—"but" we, do believe he had a bona fide contract.

Defense counsel moved for a mistrial on the basis of an imperfect verdict. Although the jury's communication clearly revealed confusion and the misconception that Zeehandelaar could be convicted simply for knowingly back dating the letter and deposit check, the

---

[1]. An indictment drawn with reasonable certainty assures that the defendant will not be tried or convicted for an offense other than the one for which he was indicted by the grand jury, that the defendant will be able to prepare an adequate defense and to address himself to the relevant questions of fact and law, that the trial court will be able to determine that the jury's verdict rests on substantial evidence, that an appellate court's affirmance will not be for a crime other than the one for which defendant was convicted, and that the defendant will not face the prospect of being placed twice in jeopardy. *See generally* Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed. 2d 240 (1962).

court denied defense counsel's motion and sent back a note to the jury, asking: "Do you find the defendant guilty or innocent of the charges contained in the indictment?"

Once again, the jury returned an ambiguous, qualified verdict: "Yes, the defendant is guilty of the charge of falsifying application." The jury was then ordered back into the courtroom and a poll taken. Juror #3 answered in the negative in response to the question whether "the defendant [was] guilty as charged." Upon questioning, the juror revealed his confusion over the wording of the indictment. Only after persistent questioning in front of the other jurors and a suggestion that the jury be sent out for further deliberations did the juror change his vote back to "yes" on the question of Zeehandelaar's guilt.

█ In light of the substantial uncertainty as to the offense charged in the indictment, which pervaded the trial and the deliberations and verdict of the jury, we cannot say that Zeehandelaar had a fair trial.

## II.

Additionally, the court erred in failing to give a limiting instruction with regard to the highly prejudicial hearsay testimony of Suzanne Pressman. On its direct case the government called Melvin Lovell, who testified to a meeting with Zeehandelaar in Tucson, Arizona on April 15 during which appellant allegedly suggested back dating an order as a means of obtaining a permit to import cheetahs. The defense raised on cross-examination the possibility that Lovell's testimony had been recently contrived in cooperation with the prosecution. After Zeehandelaar denied during the defense's case-in-chief that any meeting had occurred, the government called as a rebuttal witness, Frank Gilbert, who claimed to have been present at the April 15 meeting and to have heard Zee-

handelaar suggest back dating. Once again, the defense suggested on cross-examination that testimony as to an April 15 meeting was a recent fabrication. The government then called a second rebuttal witness, Suzanne Pressman. Over the objection of defense counsel, Pressman was permitted to testify that on April 15 Lovell had recounted to her the conversation he had had with Zeehandelaar earlier that day, and that he had told her that the appellant had suggested back dating in the course of their conversation. Although the record shows that even the prosecution had recognized the need for a limiting instruction indicating to the jury that this testimony was being admitted solely as proof of prior consistent statements regarding the April 15 meeting, the court failed to give such an instruction. Moreover, in its summation of the evidence during its charge to the jury, the court treated Pressman's testimony as though it could be given the same testimonial effect as the testimony of Lovell and Gilbert. Again, no instruction was given as to the limited purpose for which it was admitted into evidence.

█ Although we have recognized the prior consistent statement exception to the hearsay rule when on cross-examination an attempt has been made to show that a witness' testimony is a recent fabrication, United States v. Zito, 467 F.2d 1401 (2d Cir. 1972), the court should give a proper limiting instruction with regard to such testimony. United States v. Lipton, 467 F.2d 1161, 1168 (2d Cir. 1972); United States v. DiLorenzo, 429 F.2d 216, 220 (2d Cir. 1970). Here, no such limiting instruction was given.

█ For the reasons stated, we reverse.

## III.

Our reversal, however, in no way rests on one other argument made by Zeehandelaar, that the trial court improperly

intruded into the deliberations of the jury. The appellant specifically contends that the court's interrogation of three jurors, two of whom had expressed an unwillingness to reconvene for a second day of deliberations at the hour suggested by the court and one of whom was opposed to reconvening at all, was improper. Each of these jurors was questioned individually in the robing room and in the course of the interrogation of one of them, juror #3, it was revealed to the court that the jury was deadlocked, with eleven jurors favoring a verdict of guilty and one juror opposed. Zeehandelaar maintains that these interrogations were coercive and that, in any event, once the court was informed of the division in the jury, it was required to declare a mistrial.

■■ We have previously held that it is not improper for the trial court, in the exercise of its discretion, to interview individual members of a jury so long as counsel are present, as was the case here. *See* United States v. Berger, 433 F.2d 680, 686 (2d Cir. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L. Ed.2d 246 (1971). In light of the fact that one of the three jurors here was extremely agitated, the court's decision to question the jurors privately was a prudent decision. *Cf*. United States v. Colabella, 448 F.2d 1299, 1303–1304 (2d Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972). Moreover, we are not persuaded that the comments made to the jurors in the robing room were coercive or prejudicial. The fact that juror #3 revealed the division in the jury was not by itself a ground for a mistrial, since this information had not been solicited in any way by the court. *See* United States v. Jennings, 471 F.2d 1310, 1313–1314 (2d Cir.), cert. denied, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973); United States v. Meyers, 410 F.2d 693, 697 (2d Cir.), cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 86 (1969).

Reversed.