**UNITED STATES of America, Appellee,**

v.

**James PANEBIANCO et al., Defendants-Appellants.**

Nos. 106–11, 262, Dockets 76–1132–3, 76–1151, 76–1206–7, 76–1219, 76–1366.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1976.

Decided Oct. 14, 1976.

**450**

Phillip M. Sutley, Sutley & Marr, Baltimore, Md., on the brief, for defendant-appellant Snider Blanchard.

Robert Keshner, New York City (Murray Richman, New York City, and Arlen S. Yalkut, Spring Valley, N. Y., on the brief), for defendant-appellant Renato Croce.

Arlen S. Yalkut, Spring Valley, N. Y. (Bleifer & Yalkut, P. C., Spring Valley, N. Y., on the brief), for defendant-appellant Charles Brooks.

Henry Putzer, III, New York City, for defendant-appellant Lawrence Iarossi.

Michael P. Stokamer, New York City (Stokamer & Epstein, New York City, on the brief), for defendant-appellant Leonard Rizzo.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

James Panebianco, Patsy Anatala, Snider Blanchard, Renato Croce, Charles Brooks, Lawrence Iarossi, and Leonard Rizzo appeal from convictions and sentences entered on March 24, 1976 after a ten-day jury trial before Judge Bonsal in the Southern District.[1] They were convicted for a conspiracy to violate federal narcotics laws between 1968 and 1973 and for all of various substantive narcotics distribution offenses with which they were charged. Of seven other co-conspirators charged in the same indictment, three pled guilty prior to trial, three had their cases severed, and one is a fugitive.

Most of the appellants allege that there was insufficient evidence for the jury to find one unitary conspiracy. In addition, Iarossi contends that he withdrew from the conspiracy early in 1970, and he therefore claims protection from the statute of limitations and argues that his sentencing as a second narcotics offender under a statute not enacted until October 1970 was uncon-

James P. Lavin, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Nathaniel H. Akerman, Dominic F. Amorosa, Ronald L. Garnett, and Frederick T. Davis, Asst. U. S. Attys., New York City, on the brief), for appellee.

Edward Panzer, New York City, for defendant-appellant James Panebianco.

Abraham Solomon, New York City, on the brief, for defendant-appellant Patsy Anatala.

---

1. Judge Bonsal sentenced Panebianco, Blanchard, Croce, and Iarossi each to ten years in prison plus six years probation, Rizzo to five plus three, and Anatala and Brooks to three plus three. Iarossi's sentence was to run concurrently with a fifteen year sentence he was already serving.

stitutionally retroactive. Rizzo challenges the admission of testimony that he had threatened the life of a government witness; he also disputes the finding of venue over the two substantive offenses of which he was convicted and asserts a variance between indictment and proof. Croce maintains that evidence used against him was uncovered in an unconstitutional search and seizure. Blanchard disputes the relevance of an address book entry admitted against him. A claim of juror bias is also made. Since Judge Bonsal's disposition of each of these matters was entirely proper, we affirm.

Three other members of the conspiracy named in the indictment testified for the government at trial: Mary Mobley, Anthony Manfredonia, and Thomas Murray. The most important witness was Manfredonia, a New York heroin dealer with whom the various other conspirators were involved as suppliers, customers, and fellow middlemen. During the first half of the conspiracy, Manfredonia's principal partner in crime was defendant Iarossi. In 1970, however, Manfredonia took a vacation from heroin dealing for roughly six months, and upon his return he took Joseph Barone as a business associate instead of Iarossi. With Barone, as with Iarossi, Manfredonia continued to rely on the same regular source of supply (Vincent Papa in Queens) and continued to sell to his original customers (Alvin Clark and defendant Blanchard), although new deliverymen and new customers were added at various times. Further details of the conspiracy will reveal themselves as we describe the government's case against each of the defendants.

Snider "Jap" Blanchard of Baltimore bought heroin from Manfredonia from 1966 through early 1973, except for the roughly six months in 1970 when Manfredonia temporarily ceased dealing in narcotics.[2]

Lawrence Iarossi was Manfredonia's confederate from 1967 to 1970. In 1968 the two started selling to Alvin Clark in Pittsburgh in addition to Blanchard. Clark had a carrier, Mary Mobley, who testified at trial that both Manfredonia and Iarossi had made deliveries to her.

About January 1970 Iarossi told Manfredonia that he was going to let another middleman, Graziano Rizzo, supply Clark because he himself owed Rizzo some money. In February or March 1970, Iarossi delivered a half kilogram of heroin to Blanchard in Baltimore. On April 22, 1970, Iarossi was sentenced in the Southern District for an unrelated narcotics offense and he has been in prison ever since that date, although no evidence of his imprisonment was adduced at trial.

Leonard Rizzo was Graziano Rizzo's brother and partner. The two made sales to Clark from early 1970 through 1971. Mobley testified she was first introduced to Leonard Rizzo by Clark in Pittsburgh near the end of July 1970. Thereafter, she made numerous trips to New York on behalf of Clark to receive heroin packages from each of the brothers.

Also, on one occasion in early 1971 Leonard Rizzo supplied heroin to Manfredonia himself when Manfredonia's regular supplier, Papa, was temporarily unable to produce. Conversely, on one occasion in June 1971 Graziano Rizzo bought some heroin from Manfredonia. In addition, Graziano Rizzo sold a package of heroin to Manfredonia and Barone sometime in 1972.

Renato Croce was a partner of the Rizzo brothers. Mobley testified that on one occasion when she met Leonard Rizzo in New York, Croce was with him carrying the heroin. Further evidence against Croce was a pound of heroin seized by police agents in the Bronx in 1973 after a search of a car in which Croce and Graziano Rizzo had been driving. Prior to the seizure the agents had observed Croce and Rizzo in circumstances that strongly implied they were dealing in heroin. In this connection, the agents also arrested a customer of Rizzo and Croce's, Richard Navedo, in whose address book was discovered the entry "Jim Blanchard (The

2. Manfredonia's testimony was corroborated by telephone toll records showing long distance calls from his phone to Blanchard's number in Baltimore.

Jap) Somewhere on Green St., Balt., Md." Defendant Snider Blanchard's nickname was "Jap" and he lived on Greenspan Avenue in Baltimore.

James Panebianco was introduced to Manfredonia by Iarossi in 1968. In 1969 he brought some heroin to the basement of Iarossi's Bronx house for testing. On Manfredonia's mentioning to him that some of Blanchard's friends were having trouble getting heroin, Panebianco offered to provide a half kilogram. The deal fell through, however, because Blanchard's friends found another source.

In February or March 1971, Panebianco sold a quarter kilogram of heroin to Manfredonia because he was temporarily unable to obtain heroin from Papa. In July 1971 Papa's heroin stash was seized by police in Queens, and Manfredonia again went to Panebianco and bought a half kilogram. A day or so later, Graziano Rizzo came to Manfredonia's house and said he too was having trouble getting heroin; Manfredonia therefore sold him a quarter kilogram of the heroin obtained from Panebianco.

Charles Brooks was introduced to Manfredonia by Barone in the summer of 1971. Barone told Manfredonia that Brooks owed him money for heroin. Manfredonia accompanied Barone on two visits to Brooks' store on 116th Street; on the first occasion Brooks paid Barone $28,000 on his debt and on the second Brooks bought a half kilogram for $13,000.

A second witness against Brooks was Thomas Murray. Twice Murray went with Barone on deliveries to Brooks at Bronx locations. Also, at Barone's instruction in late 1974 or 1975, Murray contacted Brooks to negotiate about narcotics; Brooks, however, rejected Murray's offer as too expensive.

Patsy Anatala joined Manfredonia's organization in the fall of 1971. He brought in with him a new customer, William Huff, to whom he, Manfredonia, and Barone delivered heroin six to eight times that autumn. Murray testified that Anatala was present at a sale from Graziano Rizzo to Manfredonia and Barone at some time in 1972. Also, in November 1972, G. T. Watson, a former member of the conspiracy who had become an informant, purchased $10,000 worth of heroin from Anatala and Barone; Watson was accompanied by an undercover agent, Arthur Carter, who testified at trial.

In the face of the substantial evidence adduced by the government against all seven defendants, only two of the defendants took the stand. Leonard Rizzo testified that he had been unaware of his brother Graziano's narcotics business.[3] Croce denied any involvement in narcotics and claimed that his payments to Barone had been only in connection with Barone's operation as a moneylender.

## The Claim of Multiple Conspiracies

As has become common in narcotics conspiracy cases, the claim is made that there was insufficient evidence to support the finding of a single, overall conspiracy. Appellants assert that there were actually at least three separate and distinct conspiracies: (1) prior to Manfredonia's six-month vacation and Iarossi's imprisonment in spring 1970, a conspiracy with supplier Papa, middlemen Manfredonia and Iarossi, and customers Blanchard and Clark & Mobley as the principal figures; (2) after Manfredonia's return to the business at Barone's request in fall 1970, a conspiracy with supplier Papa, occasional suppliers Panebianco and the Rizzo brothers, middlemen Manfredonia and Barone with couriers Anatala and Murray, and customers Blanchard, Clark & Mobley, Watson, Brooks, and Huff; and (3) the Rizzo, Rizzo & Croce operation supplying Clark & Mobley and Navedo. We conclude, however, that there was ample evidence for the jury to find that all of these operations were part of one ongoing conspiracy.

Most narcotics networks involve loosely knit vertically-integrated combina-

---

**3.** Leonard Rizzo's wife also testified briefly with respect to their employment.

tions. *See United States v. Bynum,* 485 F.2d 490, 495 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). It is well-settled that individual customers and suppliers are members of one overall conspiracy if they are aware of the size of the middleman's operations. *See United States v. Steinberg,* 525 F.2d 1126, 1133 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). *See also United States v. Leong,* 536 F.2d 993, at 995–996, Nos. 76–1001, 76–1006, 76–1016 (2d Cir. 1976). Parallel sales operations can be part of the same conspiracy if there is evidence of mutual dependence and support. *See United States v. Tramunti,* 513 F.2d 1087, 1108 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Here, the Rizzos exchanged heroin with Manfredonia in times of shortage, both operations relied on Papa as a source of supply, and they shared Clark, and possibly Blanchard, as common customers. Thus, the jury could infer that both operations were components of one conspiracy.

█ It was equally reasonable for the jury to conclude that Manfredonia's operations both before and after his six-month vacation in 1970 were parts of the same continuous conspiracy. Hibernation for a few months does not necessarily signal the end of a criminal partnership. *See, e. g., United States v. Stromberg,* 268 F.2d 256, 263–64 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959). Nor is a conspiracy terminated simply by turnover in some of the personnel. *United States v. Calabro,* 467 F.2d 973, 982–83 (2d Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). After the 1970 interim Barone did take over Iarossi's role as Manfredonia's principal associate, but all the other significant relationships in the conspiracy remained intact. What is decisive here is that there was no indication during the hiatus that the other major participants in the conspiracy, Manfredonia, Papa, Blanchard, and Clark, viewed their mutual dealings as having terminated. Consequently, it could properly be inferred that their conspiracy remained alive throughout that period.

### Iarossi's Alleged Withdrawal from the Conspiracy

Iarossi claims his conviction was time-barred under 18 U.S.C. § 3282 since he withdrew from the conspiracy more than five years before August 4, 1975, the date of the indictment on which he was tried. Accordingly, he takes exception to the district court's failure either to direct an acquittal or to charge the jury with respect to the statute of limitations defense. Moreover, if Iarossi's membership in the conspiracy ceased in early 1970, his sentencing as a second narcotics offender under 21 U.S.C. § 851 would be ex post facto because the statute was not enacted until October 27, 1970.[4]

█ We conclude, however, that there was no basis in the record for submitting the issue of withdrawal to the jury. Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators. *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Schwenoha,* 383 F.2d 395, 396–97 (2d Cir. 1967), *cert. denied,* 390 U.S. 904, 88 S.Ct. 817, 19 L.Ed.2d 869 (1968). The testimony of Manfredonia about his own cessation of activities in early 1970 did not satisfy this burden of production for Iarossi. Of course, evidence that Iarossi had been incarcerated since April 1970 would have been enough to make his withdrawal a jury issue, *see United States v. Borelli,* 336 F.2d 376, 389 (2d Cir. 1964), *cert. denied,* 379 U.S. 960,

---

4. Also, Iarossi complains that his sentence as a second narcotics offender was ex post facto because his *prior* conviction was before the enactment of § 851. As long as the second offense occurs after passage of the punishment-enhancing statute, however, there is no retroactivity problem. *Gryger v. Burke,* 334

85 S.Ct. 647, 13 L.Ed.2d 555 (1965),[5] but Iarossi's counsel chose—apparently for tactical reasons—not to put the fact of this imprisonment before the jury. Consequently, Iarossi's membership in the conspiracy is presumed to have continued thereafter. Because Manfredonia did testify that Iarossi was "out of it" when Manfredonia resumed dealing in October or November 1970, there may have been a jury issue as to termination of Iarossi's participation at that time. But that was too late to be relevant to Iarossi's statute of limitations claim. In his unsuccessful request for a withdrawal instruction counsel for Iarossi did not mention that the precise date of withdrawal might bear on the possibility that sentencing as a second narcotics offender would be retroactive; we believe this omission precluded Iarossi from raising such a retroactivity claim at sentencing, after the discharge of the jury had rendered the retroactivity issue unresolvable.

An alternative ground supports Judge Bonsal's decision on the statute of limitations issue. Iarossi was originally charged in an indictment filed on February 21, 1975; the indictment of August 4, 1975, on which he was tried, only added a few other defendants and some more overt acts. A superseding indictment containing substantially the same charge as the superseded indictment should have no effect on the initial tolling of the statute of limitations so long as the defendant is not significantly prejudiced by the delay.[6] *United States v. Wilsey*, 458 F.2d 11, 12 (9th Cir. 1972); *United States v. Garcia*, 412 F.2d 999, 1000–01 (10th Cir. 1969); *United States v. Strewl*, 99 F.2d 474, 477 (2d Cir. 1938), *cert. denied*, 306 U.S. 638, 59 S.Ct. 489, 83 L.Ed. 1039 (1939); *see United States v. Alfonso-Perez*, 535 F.2d 1362, 1364 (2d Cir. 1976).[7] Iarossi made no showing that his ability to present evidence was hampered by the five-months delay between indictments. Thus, even assuming that he withdrew from the conspiracy upon his imprisonment on April 22, 1970, the indictment of February 21, 1975 tolled the five-year statute of limitations.

## The Admission of Death-Threat Testimony

Leonard Rizzo asks for a reversal because the jury heard testimony of threats made on the life of witness Mobley by him, his brother Graziano, and Clark. We conclude, however, that admission of the testimony was not an abuse of discretion under the circumstances. *See* generally *United States v. Catalano*, 491 F.2d 268, 273–74 (2d Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974).

During direct examination the prosecutor carefully steered Mobley away from mentioning any threats. However, on cross-examination by counsel for Iarossi, Mobley was asked in detail about her having set up her employer Clark by planting heroin on him for the police to find. In the course of her response she mentioned that a threat

U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948).

**5.** In *Borelli* we held that imprisonment for an offense unrelated to the conspiracy charged does not, standing alone, entitle a defendant to a directed verdict with respect to his withdrawal. Although in some instances a conspirator's incarceration will imply that his membership in the conspiracy is terminated, in other instances the conspirator's participation can continue during his prison term: he may passively retain a stake in the venture with the intention of rejoining it upon his release, or he may even manage to play an active role in the conspiracy from his prison cell. Thus, whether an imprisonment constitutes withdrawal from a conspiracy must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence.

**6.** This rule is consistent with the principal functions of statutes of limitation, which are "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970).

**7.** We note that *United States v. Klein*, 247 F.2d 908, 912 (2d Cir. 1957), *cert. denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958), and *United States v. Moskowitz*, 356 F.Supp. 331 (E.D.N.Y.1973), may be read contra, but they do not persuade us.

had been made to her by the Rizzos and Clark.

On redirect, over objections, the government was allowed to clarify this matter by eliciting the following story. Mobley was slow in delivering a package of heroin from the Rizzos to Clark. Annoyed because this would delay their receipt of payment, Graziano and Leonard Rizzo told Clark and Mobley over the telephone that they would have them both killed if the package was not resold promptly. After a second phone conversation between the Rizzos and Clark, Clark told Mobley that he himself had been instructed to kill her. Mobley therefore planted heroin in Clark's garbage can and telephoned the police to have him arrested.[8]

■■■■■ Ordinarily, unrelated death-threat testimony is kept from a jury because its potential for causing unfair prejudice outweighs its probative value with respect to a defendant's guilt. *See, e. g., United States v. Malizia*, 503 F.2d 578, 581 (2d Cir. 1974), *cert. denied*, 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 843 (1975). However, where cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility, the prosecution should generally be allowed to set the record straight on redirect. For example, this court has repeatedly held that a witness should be permitted to explain that a previous failure to implicate the defendant was due to a death threat. *See, e. g., United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); *United States v. Berger*, 433 F.2d 680, 683–84 (2d Cir. 1970), *cert. denied*, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971). Here, similarly, after Iarossi's counsel had attempted to impeach Mobley by harping on her having framed Clark, the evidence of the threats served to rehabilitate the witness by supplying a justification for her actions at the time. Although it is unfortunate that one defendant should be penalized because of the way in which another defendant's counsel conducted cross-examination, it was not an abuse of discretion for

Judge Bonsal to conclude that the rehabilitative value of the death-threat testimony outweighed any unfair prejudice to Rizzo. The possibility of such prejudice is lessened where the government's case against the defendant is as strong as it was here against Rizzo.

### Rizzo's Venue and Variance Claims

■■■■ Leonard Rizzo also contends there was insufficient evidence for the jury to find venue over the two substantive counts on which he was convicted because his transfers of the heroin to Mobley took place at Kennedy and LaGuardia airports, outside the Southern District. Rizzo was charged with receipt, *concealment* and facilitation of the transportation of heroin, 21 U.S.C. § 174, repealed, Pub.L. 91–513, Oct. 27, 1970, 84 Stat. 1291, and with distribution and *possession* with intent to distribute of heroin, 21 U.S.C. § 841(a)(1). Venue turns on whether any part of the crime was committed within the district, and the government need only prove venue by a preponderance of the evidence. *See, e. g., United States v. Leong*, 536 F.2d 993, at 996, No. 76–1001 (2d Cir. 1976). Rizzo's Bronx residency and the evidence that he and his brother used the Bronx extensively in their narcotics operations certainly afforded a sufficient circumstantial basis for the jury to conclude that the brothers had stored the heroin in the Bronx prior to delivering it to Mobley. *See id.* at 996.

■■■ We find equally insubstantial Rizzo's complaint that whereas the indictment charged him with dealing "approximately" one kilogram of heroin "in or about April 1970," Mobley only testified to a transaction in July or August 1970 involving an unspecified amount of heroin. Absent any showing of prejudice such a variance is harmless. *United States v. Edelman*, 414 F.2d 539, 542 (2d Cir. 1969), *cert. denied*, 396 U.S. 1053, 90 S.Ct. 705, 24 L.Ed.2d 698 (1970).

### Croce's Fourth Amendment Claim

During late 1972 and early 1973, agents of the Office of Drug Abuse Law Enforce-

---

**8.** The court instructed the jury to consider this evidence only with respect to Leonard Rizzo.

ment, a joint federal-state agency, were investigating the narcotics activities of Richard Navedo. Twice in January 1973, individuals later identified as Croce and Graziano Rizzo were observed making deliveries to Navedo's house in the Bronx shortly before Navedo's partner was to sell heroin to the undercover agents. On the first such occasion Rizzo drove a blue Oldsmobile, in which he took evasive action when the agents attempted to trail him.

On February 6, 1973, an undercover agent went to Navedo's gas station to purchase more heroin. When he arrived, he saw Croce and Graziano Rizzo talking with Navedo inside the station; but while the sale was being negotiated outside, Croce and Rizzo drove away. The sale consummated, Navedo and his partner were arrested and taken to Navedo's house for a search. There the officers noticed the same blue Oldsmobile driving slowly by. After a chase the passengers, Croce and Graziano Rizzo, were arrested, and a later search of the automobile uncovered an envelope containing a pound of heroin.

Prior to trial the motion was made to suppress evidence of this pound of heroin as the fruit of an unconstitutional search and seizure. It was first argued that because the heroin was suppressed in a previous trial in a New York supreme court,[9] it also had to be suppressed in the federal trial. Judge Bonsal properly rejected this argument; collateral estoppel never bars the United States from using evidence previously suppressed in a state proceeding in which the United States was not a party. *United States v. Beigle*, 370 F.2d 751, 756

(2d Cir.), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2049, 18 L.Ed.2d 989 (1967); *see Rios v. United States*, 364 U.S. 253, 260–61, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). The judge then held that given the existence of probable cause to seize the car the search was legal.[10] We agree.

As a result of their prior observations of Croce and Graziano Rizzo, the government agents clearly had probable cause to believe that the two had engaged in narcotics transactions using the car. A car used to transport narcotics is subject to seizure under the Contraband Seizure Act, 49 U.S.C. § 782. Where federal agents have probable cause to believe a vehicle is seizable under the act they may search it without a warrant, regardless of whether the vehicle has first been seized. *United States v. La Vecchia*, 513 F.2d 1210, 1216 (2d Cir. 1975). Hence the search was proper and the fruits admissible.

### The Address Book Entry

Blanchard challenges for lack of connection the admission into evidence of the entry in Navedo's telephone book, "Jim Blanchard (The Jap) Somewhere on Green St., Balt., Md." We believe the evidence was properly admitted.

The address approximates that of defendant Snider Blanchard, who lived on Greenspan Avenue in Baltimore and was also nicknamed "The Jap." From this similarity plus the defendant's failure to offer any evidence that a Jim Blanchard ever lived on Green Street in Baltimore, the inference could reasonably be drawn that it

---

9. The state judge found the search of the car illegal because based on arrests without probable cause and also because of the absence of exigent circumstances. He apparently did not consider any possible relevance of the Contraband Seizure Act.

10. By agreement of the parties Judge Bonsal held no independent suppression hearing and relied instead on the record of the state suppression hearing. Although Croce now claims that he never acquiesced in this procedure, our study of the record indicates otherwise. At a hearing before Judge Bonsal on May 12, 1975, counsel for the Rizzo brothers agreed to stand

on the record in the state court and the attorney for the government indicated that he believed Croce's counsel had also agreed to this stipulation. Although Croce's counsel was not present at the May 12 hearing, he did attend a subsequent hearing on September 3, 1975 and raised no objection when Judge Bonsal announced his denial of the suppression motion. From this record we infer that Croce's counsel did in fact agree to the stipulations prior to the May 12 hearing. In any event, his failure to object at the September 3 hearing waived any right to object thereafter.

was defendant Blanchard who was listed in Navedo's address book. This may have been evidence of an additional transactional link in the conspiracy between the Rizzos and Croce, who supplied Navedo, and Manfredonia, who usually supplied Blanchard. Used for such a purpose, a coincident address book entry is not hearsay because what is probative is the mere existence of the entry rather than the meaning intended by the writer. *United States v. Ruiz*, 477 F.2d 918, 919 (2d Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973). Once materiality and relevance are present, minor imperfections in the coincidence, such as the differences in the first names and the street names here, go only to the weight to be given the evidence by the jury.

### The Allegation of Juror Bias

Counsel for Panebianco and Anatala complained that at points during their cross-examination of Agent Carter, one juror had commented "Why doesn't he stop wasting my time with these questions?" and "Well, he's already answered that question," and another juror had said "He's got some nerve asking these questions." The attorneys asked Judge Bonsal to question the two jurors to ascertain whether they had been discussing the case with other jurors or had formed a premature opinion as to the defendants' guilt. Instead, however, the judge simply reiterated to the jury his instruction not to discuss the case or to form any opinion until all the evidence was in.

Because of his continuous observation of the jury in court, a trial judge's handling of alleged juror misconduct or bias is only reviewable for abuse of discretion. *See, e. g., United States v. Flynn*, 216 F.2d 354, 372 (2d Cir. 1954), *cert. denied*, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). Here the jurors were only exhibiting impatience with questioning by the defense counsels that had been admittedly "a little facetious" and repetitious at times. That jurors react naturally does not mean they are biased. By reiterating his cautionary instruction to the jury, Judge Bonsal did all that

was necessary. Under the circumstances this was probably a wiser course than a voir dire and was clearly not an abuse of discretion.

Panebianco's claim that he was erroneously sentenced as a second narcotics offender is not supported by the record as it seems clear to us that Judge Bonsal imposed sentence without reference to any such consideration.

Convictions affirmed.