**Mordecai WEISSMAN, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

No. 84 Civ. 5546–CSH.

United States District Court, S.D. New York.

Dec. 20, 1984.

Fisher, Puccio & Wilker, New York City, Alan M. Dershowitz, Cambridge, Mass., for petitioner; Joel Cohen, Thomas P. Puccio, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Paul Shechtman, Asst. U.S. Atty., New York City, for respondent.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

On December 17, 1981, defendant Mordecai Weissman pleaded guilty to each count of a nine-count information charging him with conspiracy to violate 18 U.S.C. §§ 1014, 1341 and 1343, and with substantive violations thereof. He was thereafter sentenced to five years imprisonment on count one, the conspiracy count; and five years on counts two through eight and two years on count nine, to run consecutive to the sentence on count one but concurrently with each other. Weissman took no direct appeal from the judgment. The Court rejected a timely Rule 35 motion for reduction of sentence.

Weissman now petitions pursuant to 28 U.S.C. § 2255 to vacate his judgment of conviction, or in the alternative for an evidentiary hearing. The grounds for the petition are the Court's asserted violations of Rule 11, F.R.Crim.P., when the guilty plea was accepted. Specifically, Weissman argues (main brief at 1) that "the Court did not establish a factual basis for the guilty pleas and failed to adequately demonstrate Petitioner's understanding of the charges against him."

### I.

Rule 11, whose full present pertinent provisions appear in the margin,[1] "requires

---

**1.** Rule 11 presently provides in part:

"(c) *Advice to Defendant.* Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:

"(1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole term; and

"(2) if the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the pro-

not only that a defendant's understanding of the nature of the charge be established before a plea of guilty may be accepted, but also that the court must satisfy itself that there is a factual basis for the plea." *Seiller v. United States,* 544 F.2d 554, 563 (2d Cir.1975), citing *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Prior to the 1983 amendments to Rule 11, fn. 1 *supra,* if Rule 11 violations were demonstrated on direct appeal from the judgment, the Second Circuit read *McCarthy* as requiring automatic reversal and remand for another hearing at which defendant might plead anew. *United States v. Journet,* 544 F.2d 633 (2d Cir.1976).[2]

The rule was always different where, as here, defendant takes no direct appeal, but asserts Rule 11 violations in a *habeas corpus* collateral attack under § 2255. Then defendant cannot rely on "technical violation of the Rule." *United States v. Timmreck,* 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979). He must allege and at least produce credible evidence of "actual prejudice." *United States v. Horsley,* 599 F.2d 1265, 1269 n. 4 (3rd Cir.1979) (en banc), cited in *Godwin v. United States,* 687 F.2d 585, 591 (2d Cir. 1982). *See also Alessi v. United States,* 593 F.2d 476, 481–82 (2d Cir.1979). Such prejudice would be established if in fact defendant did not understand the charge, or there was no factual basis for the plea. Whatever the claim, to sustain collateral attack on the sentence the demonstrated prejudice must rise to the level of a "complete miscarriage of justice" or a proceeding "inconsistent with the rudimentary demands of fair procedure." *Timmreck, supra,* 441 U.S. at 782, 99 S.Ct. at 2086, quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). Sometimes an evidentiary hearing is necessary to determine these issues, in which event the trial court is not limited to what was said at the time of plea, but may receive probative evidence from other sources. *Alessi, supra,* at 481. In other

ceeding against him and, if necessary, one will be appointed to represent him; and

"(3) that he has the right to plead not guilty or to persist in that plea if it has already been made, and he has the right to be tried by a jury and at that trial has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself; and

"(4) that if his plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and

"(5) if the court intends to question the defendant under oath, on the record, and in the presence of counsel about the offense to which he has pleaded, that his answers may later be used against him in a prosecution for perjury or false statement.

\* \* \* \* \* \*

"(f) *Determining Accuracy of Plea.* Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

"(g) *Record of Proceedings.* A verbatim record of the proceedings at which the defendant enters a plea shall be made and, if there is a plea of guilty or nolo contendere, the record shall include, without limitation,

the court's advice to the defendant, the inquiry into the voluntariness of the plea including any plea agreement, and the inquiry into the accuracy of a guilty plea.

"(h) *Harmless Error.* Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."

The Rule was amended in 1983, after Weissman pled guilty, so as to add Rule 11(h). The considerations underlying Rule 11(h) are pertinent to analysis of the present motion. *See* fn. 2 *infra.*

2. Other circuits, even prior to 1983, applied the practical equivalent of a harmless error test to Rule 11 violations urged on direct appeal. *See, e.g., United States v. Coronado,* 554 F.2d 166 (5th Cir.1977). The 1983 amendments, by adding Rule 11(h), rejected the strict interpretation of *McCarthy* by explicitly extending the harmless error concept to direct appeals based on Rule 11 violations. The Advisory Committee wrote: "Though the *McCarthy* per se rule may have been justified at the time and in the circumstances which obtained when the plea in that case was taken, this is no longer the case." I need not consider the retroactive effect of Rule 11(h) upon pleas such as the one at bar offered prior to the amendment, because Weissman took no direct appeal. His petition is for collateral relief under § 2255, where different criteria have always applied. See text immediately following.

cases the motion papers are sufficient for adjudication. *Horsley, supra,* at 1269 n. 4.

## II.

The case at bar arises out of the massive frauds perpetrated by officers and employees of O.P.M. Leasing Services, Inc. ("O.P. M."). Weissman founded the company. At the time of the frauds he and his brother-in-law and co-defendant, Myron S. Goodman, each owned 50 percent of O.P.M.'s shares. Weissman was president and Goodman vice president. They and five other O.P.M. officers eventually faced criminal charges.

Pursuant to agreements with the Government, Weissman and Goodman pleaded guilty to individual informations on December 17, 1981. The proceedings were held *in camera* at the request of all counsel. Weissman and Goodman sat next to each other on a sofa in chambers. They were flanked by Andrew M. Lawler, Esq. and Nathan Lewin, Esq., counsel for Goodman, and by Elkan Abramowitz, Esq., counsel for Weissman. AUSA Audrey Strauss was the prosecutor.

The informations were individual and the allegations did not mirror each other. However, they grew out of the same fraudulent scheme. Goodman's Rule 11 allocution took place first. According to the transcript (Appendix A to this opinion) it began at 4:00 p.m. The Court said:

Q. This information charges in essence that you and other individuals, co-conspirators and participants in the scheme, entered into a scheme to defraud lending institutions, the means of the scheme being the utilization of fraudulent devices to induce lending institutions to extend credit to O.P.M. Leasing Services, Inc. or to purchase notes from O.P.M., those fraudulent devices including the obtaining of financing on leases which had been fraudulently altered, inflating invoices, moving encumbered equipment without notifying the lending institutions which held the security interest, whose consent was required, and other forms of fraudulent and fictitious activity. Tr. 8–9.

Goodman was asked to describe the scheme in his own words. He responded:

A. Your Honor, I am nervous, and my attorney has anticipated that this question would be asked. Would you mind if I read you something that I wrote? THE COURT: Not at all.

A. On Count 1, I was vice president and 50 per cent shareholder of O.P.M. Leasing Services, Inc. In that capacity, I agreed with the other fifty per cent owner, Mordecai Weissman, and others over the period of time that we conducted the affairs of O.P.M., to fraudulently obtain financing from lending institutions by submitting false documentation to those lending institutions.

In carrying out that agreement, which I knew to be illegal, I at various times forged signatures and altered documents which were presented to the lending institutions.

Some of the ways that we defrauded the lending institutions involved forging signatures on documents, substituting false pages in financing documents for true pages, drawing up leases on non-existent equipment, submitting the same equipment and leases for financing by two lending institutions and falsely increasing the lengths of leases beyond their true terms.

Counts 2 to 16, the mail fraud and wire fraud counts, involved the same general illegal conduct that I just described. Financings generally involved the use of the mail and wire transferred funds.

While I do not remember the exact dates and amounts of these transfers, I have been informed that the documents showing the dates and amounts set forth in Counts 3 through 15 are accurate.

With regard to Count 2, I knew that officers of O.P.M. participating in the fraudulent scheme did cause a letter to be mailed in September 1980 to the attorneys for O.P.M., verifying a falsified equipment schedule.

With regard to Count 16, I received a telephone call from Mr. Friedman pursu-

ant to the illegal scheme on or about the date specified in the information.

Q. While you have read from notes, Mr. Goodman, I take it that you intend that statement to be a true and accurate statement, based upon your own knowledge this afternoon; is that so?

A. Yes, your Honor.

Tr. 11–13.

The Court accepted Goodman's guilty plea to all counts.

Weissman's allocution followed immediately, commencing at 4:30 p.m. The transcript is Appendix B. The Court first stated:

> Mr. Weisman [sic], it has been suggested by counsel on your behalf that you are now prepared to plead guilty to each of the nine counts in this information. I must decide whether or not to accept that plea, and before doing so there are certain advices that I must give to you as to your constitutional rights and also certain questions that I must ask you. The purpose both of what I will say to you and ask you is to make certain that you understand your rights under the law and are offering these pleas voluntarily and without coercion. Therefore, if at any time you don't understand anything that I say or ask and want to ask me any questions about it or if at any time during these proceedings you wish to confer with counsel, do not hesitate to say so; all right?

Tr. 4.

Weissman then said that he was 34 years old, had a bachelor's degree in psychology, and "began my master's." Tr. 4. He further responded to the Court's questions as follows:

> You are represented this afternoon by your attorney, Mr. Abramowitz, and by other counsel who have previously been identified; is that so?
>
> A. Yes, your Honor.
>
> Q. Was Mr. Abramowitz retained by you privately or appointed by the Court?
>
> A. Retained by me privately.
>
> Q. And are you satisfied with the advice and assistance that Mr. Abramowitz has given you in this case?

> A. Yes, your Honor; I am.
>
> Q. Have you read the charges contained in this information?
>
> A. Yes, your Honor; I have.
>
> Q. Have you had sufficient opportunity to discuss those charges with your attorney?
>
> A. Yes; I have had sufficient opportunity.

Tr. 5.

As to the nature of the charges, the Court advised Weissman:

> This information charges that you and others associated or affiliated with O.P.M. Leasing Services, Inc. entered into a fraudulent scheme which was intended to induce lending institutions to extend credit to O.P.M. or to purchase notes from O.P.M., that the fraudulent devices were several in kind, including the alteration of leases, the inflation of invoices and the preparation of other fraudulent documents and that in furtherance of the scheme use was made of the mails and of interstate wire communication facilities.
>
> Do you understand that to be the nature of the charges against you?
>
> A. Yes, your Honor.

Tr. 7.

Weissman described the functioning of the fraudulent scheme as follows:

> Q. Then I will ask you now, Mr. Weissman, to tell me in your own words—and take your time—just what it was that happened with respect to this scheme and in particular what your part in it was.
>
> A. Well, during the time of my tenure at O.P.M., there were numerous lease contracts that were presented to banks or other financing institutions for the purpose of obtaining loans, and these contracts were fraudulent in nature.
>
> Q. In what respect?
>
> A. In the respect that at times the signatures were forged or the cost of the equipment was inflated or at other times the same lease document, which in itself might not have been fraudulent but was

presented to two, sometimes three financing institutions simultaneously in order to obtain loans from each of them for the same contracts.

Q. And these fraudulent documents, as you have described them, were submitted to the lending institutions or the banks for the purpose of inducing them to do what?

A. For the purpose of inducing them to lend money to O.P.M.

Q. Was any use of the mails made in connection with the furtherance of this scheme?

A. Yes. At times, the mails were used, various times, to carry out this scheme.

Q. And was use of wire transmissions of any kind made also in furtherance of the scheme?

A. Yes. There were wire transfers made on various occasions, as part of the scheme.

Q. The information refers to a period of time from on or about January 1, 1971—

THE COURT: Is that correct?

MS. STRAUSS: That's correct, your Honor.

Q. (Continuing)—to and including March 11, 1981, and the information also refers specifically to a number of banks and lending institutions, dates and fraudulent leases. Are the dates and the transactions referred to in the information—do they conform generally to your recollection of the dates and the matters involved?

A. Yes, your Honor; they do. They generally conform to my recollection.

Q. Where was the office of O.P.M. Leasing Services? Where is it.

A. At the current time, your Honor, they are at 71 Broadway. There were three other locations, I believe, from the time of its inception.

Q. During the time of the furtherance of this scheme, were the offices located somewhere in Manhattan?

A. Yes. They were originally located in Brooklyn, your Honor, at two different locations, and then we moved to 99 Wall Street.

Q. And when you moved to 99 Wall Street, was the scheme referred to in this information in progress or did it thereafter come into progress?

A. It was in progress at the time we moved there.

Tr. 9–11.

The Court accepted Weissman's pleas to all counts.

Weissman and Goodman were sentenced on December 20, 1982. The transcript of the sentencing proceedings relative to Weissman appears as Appendix C. In advance of sentencing, Weissman wrote a letter to the Court under date of November 30. He writes:

I don't mean, however, to minimize in any way the seriousness of my actions, and fully realize my culpability.

Weissman describes the genesis, growth and increasing complexity of the O.P.M. frauds. Weissman gives this personalized account of the scheme's later phases and eventual exposure:

In the final stages, I knew we were sitting on a time bomb that was about to explode, but there was nothing I could do but stay until the end. Although I knew that the end of OPM would mean the end of much anguish and suffering, I also knew that before I could begin my life anew I would have to endure severe mental and physical hardships, and repay my debt to society. During the last years of OPM, not one night passed without my playing out in my mind what would eventually happen. Weekends provided some peace because I felt that only then was I immune from the chance that a phone call would come telling me that all had been discovered. When that call did come in early 1981, my worst fears turned out to be minor when compared to what actually took place.

Weissman's counsel Abramowitz submitted a sentencing memorandum in his behalf which reads in part (at 15):

Mordecai Weissman had no active role in the greater part of the Rockwell frauds. He admitted that he deliberately closed his eyes to the conduct of the others.

Although Mr. Weissman's active role in the fraud was limited to the preparation of fictitious title documentation for two Rockwell financing transactions, he is guilty of a conspiracy encompassing the whole, but his role is clearly more passive than others.

At the sentencing hearing, Mr. Abramowitz spoke for Weissman while Weissman sat at counsel table. Counsel said:

Miss Strauss quite properly points out that the fraud involved in this case involved $200 million. $190 million of that amount, however, deals with the so-called Rockwell phase of the fraud. Although we do not challenge the analysis of the government—and in fact, when we did cooperate we helped point out the fact that Mr. Weissman was equally guilty with Mr. Goodman with respect to the earlier phases of the fraud, pre-1979, the pre-Rockwell fraud—we do state, and we believe that the facts bear this out, that he is significantly less guilty in the Rockwell phase for this important reason: Although he pleaded guilty to deliberately closing his eyes to the fraud which was instigated and perpetrated throughout 1979 and 1980 by Mr. Goodman, we believe that that conduct in the context of the facts of this case was passive rather than active. Passive conduct, deliberately closing one's eyes, makes him responsible and he is guilty and he acknowledges that responsibility and will bear that responsibility the rest of his life. However, it is significant to your Honor today, it seems, to say why did Mr. Weissman deliberately close his eyes.

We submit that the facts show that Mr. Weissman, although participating in the earlier frauds on an active basis, wanted very much to withdraw from OPM in 1979 but did not do so. He is here today because he chose not to do so. What went in that judgment in not turning his back on his brother-in-law and the rest of his family and the other people connected with OPM, it seems to me is not the same as being the architect and the instigator of a fraud involving $190 million.

In no sense should you be taking my remarks as absolving or in any way attempting to absolve Mr. Weissman from serious responsibility for all phases of this fraud, but I do want you to understand, your Honor, that Mr. Weissman should not be lumped together with Mr. Goodman in determining what punishment should be meted out against him. Tr. 17–18.

After counsel had concluded, but before sentence was passed, the Court addressed Weissman:

THE COURT: Mr. Weissman, do you wish to be heard on your own behalf?

THE DEFENDANT WEISSMAN: Yes, sir.

THE COURT: Very well.

THE DEFENDANT WEISSMAN: Your Honor, most of what I would like to say my attorney has already stated or I stated to you in my letter. I would only like to reiterate that I would like to apologize for any damages to individuals or corporations because of my actions.

Thank you.

Tr. 20.

The Court then passed the sentence now subjected to collateral attack.

### III.

Serving his sentence, and with the assistance of different counsel, Weissman now says in an affidavit dated July 9, 1984 that he did not understand the charges against him; that the Court did not explain the charges to him; and that he would not have pleaded guilty if he had understood.

If in truth Weissman did not understand the charges against him, then his plea was not informed and voluntary, and cannot stand. The state of his comprehension is therefore central to Weissman's ability to demonstrate prejudice justifying collateral relief.

A threshold question arises as to the legitimate sources of evidence on the issue. I quoted under Point II *supra* Weissman's declarations and those of his counsel post-plea but before and during sentencing.

Those declarations are, of course, entirely inconsistent with the ignorance Weissman now professes; understandably he seeks to avoid them. Weissman's argument is that, even in a § 2255 motion for collateral relief, the Court's inquiry into the voluntariness of the plea or its factual basis is strictly limited to the record made at the plea proceeding.

■ There are statements supporting this view in *Irizarry v. United States*, 508 F.2d 960, 967 (2d Cir.1974), and *Seiller, supra*, at 544 F.2d 567. But *Alessi, supra*, now makes it clear that, in § 2255 proceedings, further factual development is permissible beyond the boundaries of what happened during the plea. The defendant in *Alessi* pleaded guilty, *inter alia*, to narcotics violations. Following sentence he claimed under § 2255 that he lacked a full understanding of the charge and that there was no factual basis for the plea. The Second Circuit, in the circumstances of *Alessi*, remanded for an evidentiary hearing on these factual issues:

"... there is some reason to believe that a hearing might develop both that Alessi had a full understanding of the charge and that there was a factual basis for the plea. As indicated above, Alessi has had extensive experience with narcotics offenses, going back at least to 1972, and has been represented by astute counsel who have forcefully argued that, in light of the plea agreement to the 1972 Eastern District indictment, Alessi could be prosecuted, if at all, only for a crime committed by him in the Southern District rather than the Eastern District. The Government may well be able to develop evidence that Alessi was not at all ignorant of this and thus understood the narcotics charge to which he was pleading sufficiently that collateral relief should not be granted. With respect to factual basis, Judge Bonsal had presided over a ten-day trial of Alessi's co-defendants in the 1975 narcotics indictment, see *United States v. Panebianco*, 543 F.2d 447 (2 Cir.1976) *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977), in which Manfredonia was the Government's 'most important witness,'

*id.* at 451. For all we know the record in that case may have given him ample reason for finding a factual basis for the plea; if not, the Government may now be able to demonstrate this. We thus prefer not to pass upon Alessi's contentions of lack of understanding of the narcotics charge and of factual basis for his guilty plea to it until there has been an opportunity for further factual development." 593 F.2d at 481–82.

Not only is it implicit from this discussion that the Second Circuit sanctions reference to probative evidence other than that developed or referred to during the plea, the *Alessi* court dealt with the point explicitly. The defendant argued for a limitation based on *Irizarry*: an argument the Second Circuit rejected in a footnote:

"The defendant argues that *Irizarry v. United States, supra*, 508 F.2d at 964, 967–68 requires that the showing of both the defendant's understanding of the charges and the factual basis of the plea be set forth in the record. The question whether a violation of Rule 11 in those regards provides a basis for collateral relief in the absence of prejudice, however, was neither briefed nor discussed in the opinion. Cf. *Del Vecchio, supra*, 556 F.2d at 110." 593 F.2d at 481 n. 6.

In *Del Vecchio v. United States*, 556 F.2d 106, 110–11 (2d Cir.1977), cited in the *Alessi* footnote, the Second Circuit said this:

"The effect of raising a Rule 11 violation by collateral attack rather than on direct appeal is therefore an open question in this circuit, and in the recent case of *Kloner v. United States*, 535 F.2d 730, 734 (2d Cir.1976), we specifically declined to reach the issue whether collateral relief under § 2255 is never available to remedy non-compliance with Rule 11. As we indicate below, we need not now answer this broad question. For if a defendant can raise a Rule 11 violation by a § 2255 petition, the question still remains whether the rigid rule requiring reversal for noncompliance with Rule 11 applies for both direct and collateral re-

view, or whether, on collateral attack, the court may allow for more play in the joints in assessing the effects of a Rule 11 violation. Without in any way detracting from the force of *McCarthy v. United States, supra,* or *United States v. Journet, supra,* on direct appeal, we believe that, for the reasons already given above, there must be flexibility in the collateral review of a Rule 11 claim." (footnotes omitted).

Both *Del Vecchio* and *Alessi* in the Second Circuit presage the Supreme Court's decision in *Timmreck, supra,* which requires a § 2255 petitioner complaining of Rule 11 violations to allege an actual lack of comprehension, and a disinclination to plead guilty if petitioner had been properly advised. 441 U.S. at 784, 99 S.Ct. at 2087. If those facts must be pleaded, they must also be proved, *Horsley, supra;* and the "flexibility" referred to in *Del Vecchio* finds expression in *Alessi*'s holding that proof may be derived from sources other than the plea record.

 Therefore, if a technical Rule 11 violation existed in respect of the advice given to Weissman at the time of plea, I may look to the sentencing proceedings for evidence on his actual understanding and consequent entitlement to collateral relief.

### IV.

Of course, the foregoing considerations do not arise unless the record of the plea proceedings shows Rule 11 violations. I first consider whether that record fails to reveal that Weissman understood "the nature of the charge to which the plea is offered." Rule 11(c)(1).

The record of Weissman's plea in this case may fairly be taken to include the record of Goodman's plea which immediately preceded it, and which Weissman attended. Weissman's brief on this petition creates the impression that he pleaded alone, so that the Court's statements and questions and Weissman's responses were all that took place that day. It is a false impression. Weissman sat next to his brother-in-law, equal partner, and co-defendant during the Court's advice to Good-

man, and Goodman's responses. There is no reason to suppose that Weissman heard none of those exchanges. On the contrary, I infer that he was listening closely. Weissman's plea followed immediately. Accordingly I regard the Goodman proceedings, to the extent that they pertained to Weissman's situation, as forming part of Weissman's conscious understanding at the time of *his* plea.

That said, I consider the contentions Weissman makes with respect to his professed lack of understanding. He focuses upon one particular aspect of the indictment. Before considering that aspect in detail, it is necessary to view the charging instrument in its entirety.

Count One of the information contains the conspiracy charge. The court is comprised of eight numbered paragraphs and covers pages 1–14 of the information. Paragraph 1 charges that from "on or about January 1, 1971 up to and including March 11, 1981 ... defendant Weissman, together with his co-conspirator Myron S. Goodman" and other co-conspirators conspired to defraud "lending institutions, and other entities and persons" in violation of 18 U.S.C. §§ 1014, 1341 and 1343.

Paragraphs 2–5 state the "Background of the Conspiracy." These paragraphs allege that from 1970 until its bankruptcy in 1981, O.P.M. was "jointly owned and operated by Weissman and Goodman." ¶ 2. Throughout the period of the conspiracy, "O.P.M. was primarily engaged in the business of leasing data processing equipment." ¶ 4. Paragraph 5 alleges:

"In a typical transaction in which O.P.M. leased a computer or related equipment, the lessee company would execute a lease with O.P.M. which provided for a certain monthly rental for a fixed number of months. O.P.M. would finance the purchase of the equipment by obtaining a loan from, or selling a note to, a lending institution. In such financings, the lending institutions took as collateral security an assignment of rentals due under the lease, as well as a security interest in the leased equipment."

Paragraph 6 is captioned "Overview of the Conspiracy." In view of Weissman's claim of non-comprehension invalidating his plea, it is useful to quote paragraph 6 of the information in full:

"Throughout the period of conspiracy, the defendant MORDECAI WEISSMAN and his co-conspirator Myron S. Goodman, together with co-conspirators known and unknown to the United States Attorney, utilized various fraudulent devices to induce lending institutions to extend credit to O.P.M. or to purchase notes from O.P.M. These fraudulent devices included:

"(a) obtaining financing on the basis of the same lease and the same equipment at two or three banks ('double' or 'triple discounting');

"(b) obtaining financing on the basis of leases altered to reflect higher rentals, longer terms or more expensive equipment than the lease actually executed by the lessee company;

"(c) inflating invoices for equipment to induce banks to extend larger loans than would have been available on the basis of the true value of the equipment;

"(d) obtaining financing on the basis of fictitious leases where there was equipment in existence but in fact under lease or located elsewhere;

"(e) obtaining financing on the basis of fictitious leases for non-existent equipment; and

"(f) moving encumbered equipment without notifying the lending institution which held a security interest or other parties whose consent was required.

"To facilitate these various forms of fraudulent financings, the defendant MORDECAI WEISSMAN and his co-conspirator Myron S. Goodman, and other co-conspirators, forged, altered and otherwise falsified documents presented to the lending institutions to fraudulently induce them to extend credit or to purchase notes. In addition, as a part of the overall conspiracy and to facilitate its objects, the defendant and his co-conspirators made pay-offs to various individuals, including employees of certain lessee companies and to an employee of International Business Machines Corp. ('IBM'), which employee supplied blank IBM invoices and other documents that were used periodically during the conspiracy to create fictitious title documents."

Paragraph 7 is captioned "The Means of the Conspiracy." In seven lettered sub-paragraphs, the information details a series of fraudulent transactions involving numerous lessees and lending institutions, beginning in 1972.

The seventh of these sub-paragraphs, ¶ 7(g), is captioned "Fraudulent Leases Purportedly with Rockwell International Corporation." That sub-paragraph alleges that "beginning around 1978," Goodman together with other co-conspirators "began a series of fraudulent financings all based on leases purportedly entered into" by Rockwell. The information goes on to allege that between 1978 and February 1981 Goodman and his co-conspirators fraudulently induced nineteen different lending institutions to purchase over 60 notes in 49 separate transactions. The information continues: "This aspect of the conspiracy was instigated, directed and supervised at all times by co-conspirator Myron S. Goodman"; as to Weissman, the information alleges: "The defendant Mordecai Weissman assisted in the preparation of fictitious title documentation for one Rockwell financing and deliberately closed his eyes to the existence of this aspect of the conspiracy." The information then lists the details of "transactions in which falsified Rockwell leases constituted all or part of the inducement for the purchase of the notes." As noted *supra*, comparable details are given in ¶¶ 7(a)–(f), which allege fraudulent transactions which Weissman instigated or participated in directly.

Paragraph 8 of Count One alleges the overt acts in furtherance of the conspiracy as follows:

"(a) At various times during the course of the conspiracy the defendant MORDECAI WEISSMAN forged signatures and

altered documents which were presented to lending institutions to fraudulently induce them to extend credit or to purchase notes.

"(b) At various times during the course of the conspiracy, co-conspirator Myron S. Goodman forged signatures and altered documents which were presented to lending institutions to fraudulently induce them to extend credit or to purchase notes."

Count Two of the information charges substantive violations by Weissman of the mail fraud statute. The count alleges that Weissman entered with others into the "scheme and artifice to defraud" alleged in "paragraphs one through eight of this Information"; and that he "unlawfully, wilfully, knowingly (by deliberately closing his eyes) and for the purpose of executing the scheme and artifice to defraud" caused a use of the mails, namely, a letter mailed in September 1980 by other co-conspirators to O.P.M.'s counsel "purportedly verifying the falsified terms" of one of the Rockwell leases.

Counts Three through Eight arise out of the wire fraud statute. Again, Weissman is charged with participation in the conspiracy set forth in ¶¶ 1 through 8 of the information; it is further alleged that Weissman "unlawfully, wilfully, knowingly (either by actual knowledge or by deliberately closing his eyes) and for the purpose of executing the scheme and artiface to defraud," caused certain wire transmissions. Information, ¶ 10. Count Three relates to a pre-Rockwell wire transfer of funds. Counts Four–Eight relate to wire transfers forming a part of the Rockwell aspect of the O.P.M. conspiracy.

Count Nine of the information charges Weissman with "unlawfully, wilfully and knowingly, making false statements to federally insured lending institutions" "as more specifically set forth in paragraphs 1 through 8 of this Information...." No specific details are alleged.

In his 1984 affidavit in support of the present petition, Weissman says that he "maintained from the outset, both in discussions with my previous attorneys and federal authorities, that I did not commit or participate in the over-all so-called 'Rockwell frauds', as claimed by the government." ¶ 5. Weissman says that "both before and after the guilty plea" he denied involvement, "[e]ven though the government constantly tried to convince me that I 'deliberately closed my eyes' to Myron Goodman's and O.P.M.'s role in those frauds...." *Ibid.*

In ¶ 6 of his affidavit, Weissman avers that he did not understand that by pleading guilty to the conspiracy charge he was "pleading guilty to an accusation which would result in a conviction and sentencing based on my supposed role in one entire conspiracy, as charged." Basically, Weissman claims that he did not understand the legal significance of the charge that he "deliberately closed his eyes" to the Rockwell aspect of the conspiracy; that the Court did not explain this concept to him; and that if he had understood, he would not have pleaded guilty, either to the conspiracy charge or "to the substantive counts which also alleged that I committed these crimes based on having 'deliberately closed my eyes.'" Affidavit, ¶ 6.

Paragraph 7 of the affidavit taxes the Court with failure to explain this concept to Weissman. He avers, *inter alia:* "For example, as the transcript establishes, the Court never asked me if I 'understood' the concept of 'deliberately closing my eyes.' Never having been involved in any previous prosecution, I was unfamiliar with the complex and technical legal concept involved."

Weissman's brief appears to argue that the Court should have read the indictment to Weissman in its entirety, and also specifically addressed, in a colloquy with him, the concept of "deliberately closing one's eyes," a concept also known to the criminal law as "conscious avoidance."

Weissman places significant reliance upon *Irizarry, supra,* in which the Second Circuit observed generally: "Just how much explanation is necessary in each particular instance will vary from case to case." 508 F.2d at 964. In *Irizarry,* defendant's plea to a conspiracy charge was

vacated under Rule 11 where "[t]he closest that the court came was to identify the charge as 'conspiracy'; conspiracy *to do what* was never mentioned." 508 F.2d at 964 (emphasis in original). The Second Circuit concluded on the point:

"Finally, at no time was Irizarry asked whether he understood the nature of the offense with which he was charged, nor did he volunteer that information, nor did he say anything from which such an understanding might be inferred. Rule 11 forbids the acceptance of a guilty plea in such circumstances." *Ibid.*

The footnotes to *Irizarry,* e.g. 508 F.2d 965 n. 4, indicate that in some cases the reading of the indictment may be sufficient; in other cases it may not; each case turns on its own circumstances.

*Irizarry*'s emphasis upon the circumstances of each case is echoed by the Advisory Committee's notes to the 1983 amendment which added Rule 11(h). *See* fn. 1 and 2, *supra.* The 1975 amendments to the rule, which spelled out in greater detail the advice the trial judge must give to a pleading defendant, made it become, in the Committee's words, "more apparent than ever that Rule 11 should not be given such a crabbed interpretation that ceremony was exalted over substance." The Committee report on the 1983 amendments quotes from *United States v. Scharf,* 551 F.2d 1124 (8th Cir.1977) ("[Rule 11] is a salutary rule, and district courts are required to act in substantial compliance with it although ... ritualistic compliance is not required."); and from *United States v. Saft,* 558 F.2d 1073, 1079 (2d Cir.1977) ("Congress meant to strip district judges of freedom to decide *what* they must explain to a defendant who wishes to plead guilty, not to tell them precisely *how* to perform this important task in the great variety of cases that would come before them.") (emphasis in original). The Advisory Committee then observes:

"Two important points logically flow from these sound observations. One concerns the matter of construing Rule 11: it is not to be read as requiring a litany or other ritual which can be carried out only by word-for-word adherence to a set 'script.' The other, specifically addressed in new subdivision (h), is that even when it may be concluded Rule 11 has not been complied with in all respects, it does not inevitably follow that the defendant's plea of guilty or nolo contendere is invalid and subject to being overturned by any remedial device then available to the defendant." West's Rules of Criminal Procedure (1984 ed.) at 50.

■ Where the defendant establishes that during the plea proceedings the district judge "significantly misinformed" defendant of the nature of the charge, so that defendant received "incomplete and incorrect advice" coupled with "the defendant's assertion of facts indicating an innocent state of mind," the district court's reading of a "truncated version" of the indictment, complicated by the incorrect advice, is insufficient to sustain the plea. That is the holding of *Godwin v. United States,* 687 F.2d 585, 589 (2d Cir.1982), also relied upon by Weissman.

■ It is true that the Court did not read the entire text of the present indictment to either Goodman or Weissman. However, under the pragmatic, case-by-case analysis of the authorities discussed *supra,* there is no inflexible requirement that this be done. That view is supported by Judge Friendly's rationale in *Saft, supra.* Although in point of fact the district judge in *Saft* read the indictment to the defendant, the Court of Appeals' discussion suggests that in the circumstances of the case, that was not necessary:

"At the outset, after hearing defense counsel's application for entry of the guilty plea, the district court elicited from Saft that he was 53 years old, that he was the founder of Adlay, and that he held a Bachelor of Science degree from Columbia University. During this inquiry the court also determined that Saft had received a copy of the indictment and had read it. Nevertheless, the district

court instructed the clerk to read aloud the pertinent counts." 558 F.2d at 1076. And again at 1079:

"Beyond this the judge ascertained that .Saft had previously read the indictment and had conferred about the charges with counsel who had explained them to him. The counts were simply phrased and readily understandable by a man with Saft's experience, education and intelligence. The contention that even in such circumstances the judge must deliver to the defendant the equivalent of a jury charge finds no support in the language of the Rule and runs counter to the legislative history." 558 F.2d at 1079.

Judge Friendly quotes the following comment from the Advisory Committee Notes:

"The method by which the defendant's understanding of the nature of the charge is determined may vary from case to case, depending on the complexity of the circumstances and the particular defendant."

In the case at bar, Weissman's new counsel argues that the facts of the case at bar "surely are among the most complex of financial transactions and criminal charges imaginable." Main brief at 24. I do not agree. The indictment is long, not because the facts or charges are complex, but because Weissman and Goodman succeeded in perpetrating their commercial frauds for so long before the O.P.M. house of cards came tumbling down. The conspirators' *modus operandi* was perfectly simple; neither Goodman nor Weissman had any difficulty in describing it at their back-to-back allocutions. Goodman said that he, Weissman and others agreed "to fraudulently obtain financing from lending institutions by submitting false documentation to those lending institutions." Slip op. at 5. Weissman said: "... during the time of my tenure at OPM, there were numerous lease contracts that were presented to banks or other financing institutions for the purpose of obtaining loans, and these contracts were fraudulent in nature." *Id.* at 8. Weissman readily and easily described the particulars of the fraud:

"In the respect that at times the signatures were forged or the cost of the equipment was inflated or at other times the same lease document, which in itself might not have been fraudulent but was presented to two, sometimes three financing institutions simultaneously in order to obtain loans from each of them for the same contracts." *Id.* at 8-9.

Weissman also acknowledged during his allocution that he had read the charges against him, and had sufficient opportunity to discuss those charges with his attorney, Mr. Abramowitz. Mr. Abramowitz was and is an experienced criminal law advocate, having previously served as head of the criminal division of the United States Attorney's Office for this district. In the light of those acknowledgments and Weissman's responses, I conclude that the record at the time of plea sufficiently demonstrates Weissman's understanding of the conspiracy charge against him.

In reaching that conclusion, I note that Weissman's profession of ignorance concerning the conspiracy count is highly selective. That is to say: it focuses solely upon the phrase "deliberately closed his eyes" and the related concept of conscious avoidance. But this asserted lack of comprehension has to do only with the latter phases of the fraudulent Rockwell transactions. And the Rockwell frauds, while numerous and economically significant, by no means comprised the entire conspiracy. They comprised only its closing phase, covering the period 1978–February, 1981. The O.P.M. frauds, as described in the information, began in 1972, with Weissman an instigator and full participant. The pre-Rockwell frauds were also numerous and economically significant, succeeding in bilking lending institutions of millions of dollars, albeit not as many millions as those realized by the Rockwell frauds.

▮ The phrase "deliberately closed his eyes" is cast in simple English, comprehensible to one of Weissman's education. Weissman's acknowledgments that he had read the information and discussed it with experienced criminal defense counsel would

require a strained reading of the plea proceedings in order to conclude that Weissman did not understand the conscious avoidance concept. I decline to indulge in that construction. However, assuming *arguendo* that the plea proceedings do not sufficiently disclose Weissman's understanding of that particular aspect of the conspiracy charge, there can be no question that he understood the genesis and overarching nature of the O.P.M. conspiracy, and his part in it. The plea proceedings sufficiently demonstrate Weissman's understanding of the conspiracy charge to bar collateral relief from the judgment.

So too with the substantive counts. Again assuming *arguendo* an insufficient showing of Weissman's understanding of conscious avoidance at the time of plea, that ignorance relates only to the Rockwell aspects of the ongoing O.P.M. fraud. But Count Three, a wire fraud count, deals with a 1976 wiring of funds which played a part in the pre-Rockwell frauds, concerning which Weissman's understanding is demonstrated beyond peradventure by the plea proceedings. Since the sentences on the substantive counts, while consecutive to the conspiracy count. ran concurrently with each other, there is no basis for collateral relief on this aspect of the case as well, even assuming that the Court's review is limited to what transpired at the time of plea.[3]

But the Court's review is not so limited in this § 2255 proceeding, as demonstrated under Point III, *supra;* and Weissman's perfect comprehension of all aspects of the charges against him is amply demonstrated by the sentencing proceedings, further analyzed under Point V, *infra.*

### V.

Whatever doubt may arise from the plea proceedings concerning Weissman's understanding of the charges against him is entirely laid to rest by his pre-sentence submissions and the sentencing proceedings. Those sources, which I may consult on the present motion, clearly reveal Weissman's complete comprehension.

Thus, as noted *supra,* Mr. Abramowitz wrote on behalf of Weissman prior to sentencing that Weissman "admitted that he deliberately closed his eyes to the conduct of the others," so that, while actively involved in the preparation of fictitious title documentation for only "two Rockwell financing transactions, he is guilty of a conspiracy encompassing the whole...." Addressing the Court at the time of sentence, Mr. Abramowitz said: "Passive conduct, deliberately closing one's eyes, makes him responsible and he is guilty and he acknowledges that responsibility and will bear that responsibility the rest of his life." A clearer acknowledgment of the concept of conscious avoidance, and the consequence of deliberately closing one's eyes to an ongoing conspiracy, can hardly be imagined.

Weissman's present counsel argues that Weissman should not be bound by his attorney's words. But it is fanciful to suppose that Abramowitz submitted his presentence memorandum on Weissman's behalf without the latter having read and approved the text. Furthermore, Weissman sat next to Abramowitz when the latter made comparable acknowledgments during his remarks at sentencing. Not only did Weissman utter no demur to what Abramowitz said, he stated when it came his turn to speak that "most of what I would like to say my attorney has already stated...."

But it is not necessary to decide the issue of Weissman's comprehension upon these implicit endorsements of the statements of counsel. Weissman, in his own pre-sentencing letter to the Court, states explicitly: "In the final stages, I knew we were sitting on a time bomb that was about to explode, but there was nothing I could do but stay until the end.... When that call did come in early 1981, my worst fears turned out to be minor when compared to what actually took place." This is a classic

---

**3.** Weissman makes no argument, at least expressly, that he did not understand Count Nine of the information, or that there was no factual basis for his plea to it.

rendition in lay terms of the legal concept of conscious avoidance and its consequences. Weissman's awareness that in the "final stages" of the O.P.M. frauds he was "sitting on a time bomb that was about to explode" is consistent only with an awareness that the fraud was ongoing, although (as he elsewhere acknowledged) he deliberately closed his eyes to the details.

It would be a remarkable omission for as experienced criminal counsel as Abramowitz to fail to explain to Weissman the concept of conscious avoidance, and Weissman's attendant vulnerability in the circumstances of the case. Yet this is what the present petition asks me to assume. Not only is there no affidavit from Abramowitz on the point; Weissman's own declarations belie the assumption he asks me to make.

In short, the record in this case amply demonstrates Weissman's understanding of all aspects of the charges against him, both in the conspiracy and the substantive counts.

## VI.

Little need be added to demonstrate that, in compliance with Rule 11(f), the Court had before it sufficient probative information to satisfy it that there was a factual basis for Weissman's plea. I considered Goodman's description of the fraudulent scheme, as I was entitled to do under *Alessi, supra,* as well as Weissman's description during the plea. I may also, on this application for collateral relief, consider what was said before and during sentencing. I need not go again into the details of that material. Suffice it to say that they furnished a more than adequate factual basis for accepting the pleas of guilty which Weissman offered.

## VII.

Under *Timmreck, supra,* in order to obtain collateral relief on this § 2255 petition Weissman must demonstrate Rule 11 violations which brought about a "complete miscarriage of justice" during the course of a

proceeding "inconsistent with the rudimentary demands of fair procedure." This record does not support such a claim.[4] On the contrary, the record reveals a sophisticated, well-advised and fully comprehending defendant who pled guilty to clearly established crimes, but now repents of his plea because he is dissatisfied with his sentence. Weissman's present protestations of ignorance and innocence are belied by the contemporaneous statements he made and made on his behalf. They are simply not worthy of belief. No evidentiary hearing is necessary.

Since the petition is lacking in merit, it is in all respects denied.

It is SO ORDERED.

---

**4.** The Government calls my attention to *Willbright v. Smith,* 745 F.2d 779 (2d Cir.1984). As petitioner points out, the petition in *Willbright* lay from a state court guilty plea, to which Rule

11 is not applicable. However, the Second Circuit's decision at 780–781 shows that in the case at bar Weissman has no viable constitutional claim.